**SEALED**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

FILED BY _____ D.C.

OCT 24 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

KAWS, INC.,

    Plaintiff,

v.

PRINTIFY, INC., JANIS BERDIGANS, and
JOHN DOES 1–10,

    Defendants.

Civil Action No. _____

**COMPLAINT**

**JURY TRIAL REQUESTED**

Plaintiff KAWS, Inc. ("KAWS") files this Complaint against Printify, Inc. ("Printify"), Janis Berdigans ("Berdigans" or "Printify's Founder"), and John Does 1–10[1] (collectively, "Defendants"), and in support states as follows:

### INTRODUCTION

1.  KAWS brings this action against Defendants to stop the widespread and ongoing manufacturing, advertising for sale, and sale of counterfeit KAWS products and the infringement of KAWS's intellectual property rights, and to obtain an accounting and other relief based on Defendants' unlawful conduct and corresponding financial gain.

2.  KAWS tried without success to put a stop to this unlawful conduct. Through counsel, KAWS sent _73_ cease and desist letters seeking to stop the misappropriation and unauthorized use of KAWS's intellectual property rights by Defendants in connection with their manufacture and sale of counterfeit and infringing products (the "Counterfeit and Infringing Products"). Despite those efforts, Defendants' unlawful conduct continues, with new Counterfeit and Infringing Products popping up

---

[1] KAWS believes other individuals, whose identities have not yet been discovered, are also liable as joint tortfeasors with the named defendants. Their identities will be the subject of discovery as this case proceeds.

for sale on a regular basis.

3.      Defendants unlawfully profit from the proliferation of online counterfeiting, which has become a global threat to intellectual property rights.   Abandoning localized brick-and-mortar storefronts, and enabled by companies like Printify and people like Mr. Berdigans, counterfeiters have turned to the internet to exploit its expansive reach and the high level of anonymity it offers.

4.      Defendants play a key role in the increasing sale of counterfeit goods, leveraging a massive online presence comprising of at least 8 million Printify merchants to create and distribute counterfeit and infringing and goods in this District and across the country while disguising Printify as a legitimate and compliant print on demand ("POD") company.

5.      Having fulfilled over 21 million orders since 2015, with sales of over $500 million, mostly in the United States, and with an ever-increasing network of merchants growing by the millions year on year, thereby allowing for the sales of counterfeit goods to follow the same upwards trajectory, Defendants' continuous expansion represents the most formidable threat to the preservation of intellectual property rights.

6.      To increase their sales of counterfeit and infringing products, Defendants are involved with and promote the creation of numerous "stores" for these sales, disguised as storefronts for purported third-party Printify merchants that "connect" their domain names and other e-commerce accounts directly to Printify, where digitized counterfeit and infringing products held in Printify's database are then published online by Printify (the "Defendants' Online Storefronts").

7.      Defendants' Online Storefronts and the Counterfeit and Infringing Products sold through them are actually under Defendants' control: Defendants exercise significant control over the manufacturing, printing, shipping, customer service, and all other logistical and fulfillment requirements in the creation and distribution of Counterfeit and Infringing Products.   Indeed, Defendants, not any third-party merchant, have complete control over the ability to publish products

2

online on Defendants' Online Storefronts—the very critical and initial action in the cycle of counterfeit and infringing products entering into the stream of commerce.

8.      Based on KAWS's investigation to date, Defendants' focus appears to be on creating the false impression of legality, while actively concealing their illegal activities and seeking to prevent and obstruct enforcement efforts.  For example:

      a.      Counterfeit and Infringing Products purchased from Defendants' Online Storefronts are delivered in packaging labeled with default Printify return addresses, but those addresses mostly appear to be virtual addresses, private residences, or unrelated businesses (such as a Goodwill Store), that have nothing to do with the sale, and when viewing the tracking history of the packages, the packages do not originate from anywhere near the listed "default" return addresses.

      b.      Emails that appear to be sent from Defendants' Online Storefronts are sent to purchasers of Counterfeit and Infringing Products with tracking details, but upon closer examination, those emails are not actually sent from any publicly facing e-mail address displayed on Defendants' Online Storefronts. Rather, they are sent from a hidden email address "via Printify.com."

      c.      Defendants associate themselves with a San Francisco address in their promotional materials,[2] including emails, but in reality, Defendants stopped using that address years ago, and their headquarters is not in the United States but rather Riga, Latvia.  In fact, all but a miniscule number of Defendants'

---

[2] *Printify vs CustomCat*, Printify, https://printify.com/printify-vs-customcat/ ("Printify is the world's most famous print-on-demand platform HQ'd in San Francisco, USA, founded in 2015") (last accessed October 23, 2023).

employees and various contractors are located in Europe, mainly in Latvia and Estonia.

d.    Printify has directed merchants to report to Printify's support team for investigation any instances where "Printify" appears on the product packaging, as Printify conceals its involvement in the transaction and does not approve any reference to Printify on packaging or labeling.

e.    Defendants represent that Printify will remove any listings that contain infringing content in the title descriptions for products published and advertised on Defendants' Online Storefronts, but Printify does not actually do that. Defendants instead continue to push the sales of those listings in exchange for a profit.

f.    If any third party has managed to uncover that Defendants are in fact the controlling force behind the Counterfeit and Infringing Products on Defendants' Online Storefronts, they will have difficulty reporting those instances of intellectual property infringement. Defendants have imposed obstacles that impede access to reporting, and for those who somehow manage to locate Printify's reporting mechanism, Printify's reporting form then expressly discourages such reporting, in particular trademark infringement.

9.    KAWS's global brand has found itself in the crosshairs of Defendants' counterfeiting operations. Despite the 73 cease and desist letters sent to Defendants' Online Storefronts, Defendants' conduct continues unabated, and the manufacture, publishing, advertising for sale and sales of Counterfeit and Infringing Products persists. KAWS brings this action to put a stop to this ongoing unlawful, non-compliant conduct and to hold Defendants accountable for their deliberate and illegal actions.

10.     Defendants trade upon KAWS's reputation and goodwill by selling and/or offering to sell products in connection with both a portion of KAWS' trademarks, which are covered by U.S. Trademark Registration Nos. 6,102,260, 6,046,763, and. 6,116,823 (collectively, the "KAWS Trademarks" or "KAWS Marks"), and KAWS's copyright works, in particular U.S. Copyright Office Registration Nos. VA 2-180-272 (the companion character) and VA2-182-652 (the BFF character) (together, the "Companion Copyright"). The registrations are valid, subsisting, and in full force and effect. True and correct copies of the federal trademark registration certificates for the KAWS Trademarks are attached as **Exhibit 1**. True and correct copies of the federal copyright registration certificates for Companion Copyright are attached as **Exhibit 2**.

11.     Defendants' patently unlawful and non-compliant conduct cannot persist without consequence.

## THE PARTIES

12.     Plaintiff KAWS is a New York corporation with its principal place of business in Brooklyn, New York.

13.     Defendant Printify is a Delaware corporation with its principal place of business in Riga, Latvia.

14.     Upon information and belief, Defendant Janis Berdigans is an adult domiciled in Latvia.

15.     Upon information and belief, John Does are individuals who are consciously participating in the manufacture, distribution, sale, and advertisement of Counterfeit and Infringing Products, or who consciously and directly benefit financially from the manufacture, distribution, sale, and advertisement of Counterfeit and Infringing Products, but whose identity and number are presently unknown.

## JURISDICTION AND VENUE

16.     This Court has federal subject matter jurisdiction over the claims asserted in this action

pursuant to 28 U.S.C. §§ 1331 and 1338 because this action arises under the federal Copyright Act and Lanham Act. *See* 17 U.S.C. §§ 1101, *et seq.*; 15 U.S.C. §§ 1051, *et seq.*, as well as pursuant to 15 U.S.C. § 1121 as an action arising out of violations of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* Because the parties are citizens of different States and the matter in controversy exceeds, exclusive of interests and costs, the sum of seventy-five thousand dollars, this Court also has jurisdiction under 28 U.S.C. § 1332. Jurisdiction over the state law claim is also appropriate under 28 U.S.C. § 1367(a) and principles of pendent jurisdiction because that claim is substantially related to the federal claims.

17.     Venue is proper pursuant to 28 U.S.C. § 1391 because Defendants conduct business in this District and, on information and belief, a substantial part of the events or omissions giving rise to the claims occurred in this District and has caused damage to KAWS in this District.

18.     Personal jurisdiction exists over Defendants because Defendants regularly conduct, transact and/or solicit business in Florida and in this District, supply their goods (including the Counterfeit and Infringing Products) and services to consumers in Florida and in this District, derive substantial revenue from their business transactions in Florida and in this District, and/or otherwise avail themselves of the privileges and protections of the laws of the State of Florida, such that this Court's assertion of jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice. Defendants have purposefully solicited business from Florida residents through the use of fully interactive commercial websites, which have been accessed in Florida, have published and made listings of Counterfeit and Infringing Products accessible in Florida, and Defendants have accepted payment from Florida for such goods.

## FACTUAL ALLEGATIONS

### I.     KAWS's Iconic Products and Intellectual Property Portfolio.

19.     Artist and designer Brian Donnelly, President of Plaintiff and who is better known by his pseudonym, KAWS, has been creating images and sculptures based on innovative and original

6

characters since he began his career as a graffiti artist in the early 1990s. KAWS's works and products possess unique and novel designs that have become a global sensation and can be found in galleries, institutions, and private collections worldwide.

20. Mr. Donnelly has been described as "a bona fide cultural phenomenon." He has collaborations with brands like Dior and UNIQLO. Mr. Donnelly was ranked #29 in ArtReview's "Power 100" list of the most influential people in 2021 in the contemporary art world, which described him as a "brand name through commercial partnerships and celebrity supporters that few can match."

21. Much of KAWS's art (and commercialized products embodying and/or displaying that art) involves the repeated use of a cast of figurative characters and motifs that appear in a variety of settings and poses and involve a distinctive shared visual and conceptual vocabulary involving skull-and-crossbones heads and/or X eyes, including those which comprise the KAWS Trademarks and Companion Copyright ("KAWS Products"). The KAWS Products span an array of categories, from high end art pieces and larger than life sculptures to small figurines, t-shirts, hoodies, and other everyday apparel and merchandise.

22. KAWS is the registered owner of the following trademarks, being the KAWS Trademarks, duly and legally issued by the United States Patent and Trademark Office. *See* Exhibit 1.

| U.S. TM Reg. No. | Trademark | Registration Date | Relevant Class |
|---|---|---|---|
| 6,102,260 |  | July 14, 2020 | Class 25: Shoes; T-shirts. |
| 6,046,763 | KAWS | May 5, 2020 | Class 16: Paintings; photographs; drawings; prints; postcards; paper shopping bags.<br><br>Class 18: Leather bags, backpacks, umbrellas, tote bags, canvas shopping bags, reusable shopping bags.<br><br>Class 20: Pillows; furniture; works of art made of wood.<br><br>Class 25: Clothing, namely, t-shirts, jackets, button-down shirts, trousers, socks, belts, sweatshirts, hats; footwear, namely shoes, sneakers |
| 6,116,823 | ✕ ✕ | August 4, 2020 | Class 18: Leather bags; tote bags; canvas shopping bags; reusable shopping bags.<br><br>Class 25: Shirts. |

22.   From the date of the creation of the first KAWS Products to the present, KAWS has been the sole and official source of genuine KAWS Products in the United States. The KAWS Products are sold through KAWS's exclusive representation by Skarstedt Gallery and through licensed and authorized collaboration partners, including various well-established commercial brands, as well as museums, museum stores and associated websites.

23.   The KAWS Trademarks have been substantially and continuously marketed and promoted by KAWS since at least 1999 in respect of the '763 mark, 2002 in respect of the '260 mark,

and 2016 in respect of the '823 mark.  KAWS has and continues to widely market and promote the KAWS Trademarks through the KAWS Products in the industry and to consumers.

24.     The registrations for the KAWS Trademarks are prima facie evidence of their validity and of KAWS' exclusive right to use those trademarks under 15 U.S.C. § 1057(b).

25.     The KAWS Trademarks qualify as famous marks, as that term is used in 15 U.S.C. §1125(c)(1), and they have been continuously used and never abandoned.  Since the launch of the KAWS Products, KAWS has followed a defined strategy for positioning its brand, marketing, and promoting the product line in the industry and to consumers.  KAWS's promotional efforts for the KAWS Products include, for example, the kawsone.com website, through the Skarstedt Gallery, and by showing works at international art fairs.

26.     For example, since at least 2010  KAWS has showcased at Art Basel Miami Beach, one of the largest international art fairs in the world that attracts art collectors, artists, galleries, and art enthusiasts to Miami Beach, Florida every December..  Moreover, establishing itself as a prominent hub for international art events and contemporary art, this year,   a sixteen-foot sculpture of KAWS's Companion Character titled "Waiting" was installed in Coral Gables, Florida.

27.     Additionally, KAWS extensively promotes KAWS Products on social media such as Instagram (over 4.2 million followers).

28.     KAWS approves and maintains quality control over all KAWS Products and makes systemic efforts to safeguard the quality and integrity of the KAWS Trademarks.  KAWS has also expended substantial time, money, and other resources in advertising and otherwise promoting the KAWS Products.  As a result, products bearing any one of the KAWS Trademarks are widely recognized and exclusively associated (including by consumers and members of the public) as being products sourced from KAWS. For example:

    a.  ArtReview named Mr. Donnelly (a.k.a. KAWS) as #29 in its 2021 list of the 100 most

influential people in the contemporary art world, stating that "he has, in the past 20 years, achieved a level of brand recognition through commercial partnerships and celebrity supporters that few in the field can match."

b. In a February 9, 2021 profile, the New York Times Magazine described Mr. Donnelly as "an increasingly recognizable sight at major art institutions," observing that "you could make the argument that Donnelly is the most beloved contemporary artist alive today," and he attracts "a level of enthusiasm among his fans usually reserved for actual pop stars. In the summer of 2019, when Donnelly debuted a new T-shirt line with Uniqlo that featured his characters, the release caused near riots in multiple malls across mainland China."

27. In addition, KAWS is the owner of several artistic copyright works, both registered and unregistered, including the Companion Copyright. *See* Exhibit 2.



28. KAWS owns all exclusive rights, including the rights to reproduce the copyrighted works in copies, to prepare derivative works based upon the copyrighted works, and to distribute copies of the copyrighted works to the public by sale or other transfer of ownership, or by rental, lease, or lending, in its various copyright works and in particular, the Companion Copyright.

**II.    The Rapid Rise of Infringement and Counterfeiting in the POD Industry.**

29.    Print-on-demand or "POD" involves the creation ("printing") of products after an order is placed as opposed to in advance, keeping a stockpile of inventory.

30.    Advancements in printing technology and increasing purchasing capabilities have propelled the growth of the POD industry.

31.    One of the major risks with POD is, as in this case, the ease at which the manufacture and sale of counterfeit and infringing products can (and does) occur, as well as the speed at which the volume of those sales can increase, particularly in light of the ability to create such products, quite literally, "on-demand."

32.    Unsurprisingly, this has resulted in litigation.  For example, in 2018, a district court in the Eastern District of Wisconsin granted summary judgment (and then entered judgment) against POD company SunFrog for claims of direct and contributory infringement, including because SunFrog was directly involved with the sales and did "most of the legwork in the transaction" for the infringement.

33.    The success of the KAWS Products has resulted in significant counterfeiting, and the rise in popularity of and ease of access to POD companies has only heightened the degree of Counterfeit and Infringing Products in the market.  While that fact is problematic itself, to make matters worse, Defendants take things a step further and set themselves apart from POD competitors by failing to implement safeguards to prevent or curb intellectual property infringement they are responsible for. Defendants instead simply seek to hide behind automated processes to improperly insulate themselves from liability.

**III.    Defendants' Expansive Infringement and Counterfeiting of the KAWS Trademarks and Companion Copyright.**

34.    Started in 2015, Printify now claims to be the largest global print network with over $500 million in sales.

35.    Printify's growth has accelerated over the years, growing from 80 employees in 2019, to

11

300 by the end of 2020, to 500 in 2021, and with public statements announcing its plans to double to 1,000 by the end of 2022.

36. Printify was valued at $300 million two years ago, and it is reportedly working towards becoming a multibillion-dollar company.

37. Defendants take an active role in creating products, managing orders, and handling customer service, where (in Printify's own words) Printify will "do everything." For example, for setting up sales through Etsy, Printify instructs merchants to select the option regarding the production process stating that Printify (the "partner") will "do everything."[3] Once Printify publishes a product online on one of Defendants' Online Storefronts, "Printify handles the rest (quality control, reprints, refunds) without [the merchant] needing to do a thing."

38. Printify's business includes partnerships with serial counterfeiters. With its vast online reach of more than 8 million merchants, Printify is directly involved with and actively contributes to the proliferation of infringing and counterfeit goods in this District and throughout the United States.

39. Defendants unlawfully manufacture, advertise, market and sell unauthorized and illegal products, including the Counterfeit and Infringing Products that misappropriate and use without any authorization the KAWS Trademarks, by applying marks identical to the KAWS Trademarks to goods in respect of which the KAWS Trademarks are registered, as well as, in many instances, reproducing a substantial part of the Companion Copyright on those same goods, which causes further confusion and deception in the marketplace.

40. For example, Defendants create and manufacture various types of Counterfeit and Infringing Products, including counterfeit KAWS shirts, sweatshirts, long sleeve tees, and hoodies.

---

[3] For example, to comply with Etsy's policies, Printify instructs merchants working with Printify to disclose to Etsy that Printify, not the seller, makes the products sold. Printify then instructs merchants on how to "keep the full production partner details *hidden from your customers*."

12

Without Defendants, the Counterfeit and Infringing Products would not exist. As discussed above, it is Defendants, and not any third-party merchant, that exercise control over the ability to publish products online on Defendants' Online Storefronts, including Counterfeit and Infringing Products. That action is critical and is the initial step towards propelling counterfeit goods into the stream of commerce. Only after a product is published is it possible for that product to then be purchased by an end-consumer, where Defendants take the baton again, as Printify proudly "handles the rest," all the way through to ensuring counterfeit products are delivered to consumers. The extensive degree to which Defendants play a key role in creating and manufacturing the Counterfeit and Infringing Products and placing them into the market is discussed further below.

41.     Defendants actively seek to conceal their involvement. KAWS has identified numerous of Defendants' Online Storefronts connected to Printify to further the creation, manufacture, sale, offering for sale, and distribution of Counterfeit and Infringing Products to consumers in this District and throughout the United States. Defendants hide their unlawful practices behind these storefronts, which purport to sell genuine KAWS Products.

42.     On information and belief, Defendants' Online Storefronts include without limitation the storefronts identified in Exhibit 1 to the Kavanaugh Declaration filed in support of KAWS's motion for a temporary restraining order.

43.     On information and belief, among other well-established institutions and/or marketplaces, and subject to further discovery regarding the scope of the reach of Defendants' operations, Defendants and Defendants' Online Storefronts also offer, advertise for sale and/or sell counterfeit and infringing products online through Walmart.


44.     KAWS has discovered similarities among some of Defendants' Online Storefronts, such as the fact that many are owned by a Vietnamese company named "GMO-Z RUNSYSTEM" and hosted

by a Japanese company named "GMO Internet Company." KAWS's investigation is ongoing in terms of these similarities and the various individuals and companies involved.

45.  Below are representative examples of Counterfeit and Infringing Products offered for sale through Defendants' Online Storefronts during October 2023:

| Genuine KAWS Products | Counterfeit and Infringing Products |
|---|---|
|  |  |
|  |  |



| Genuine KAWS Products | Counterfeit and Infringing Products |
|---|---|
| | |



46.    KAWS has sent over 70 cease and desist letters evidencing and asserting the KAWS

Trademarks and/or Companion Copyright and demanding the removal of Counterfeit and Infringing Products from Defendants' Online Storefronts. Despite that fact, the sale of Counterfeit and Infringing Products is ongoing and through what appears to be an ever-increasing number of Defendants' Online Storefronts. Being fully on notice as to the scope of the KAWS Trademarks and/or Companion Copyright, many of Defendants' Online Storefronts either continue to display the identified infringing listings or offer additional Counterfeit and Infringing Products for sale.

47.     KAWS has not licensed or authorized Defendants or Defendants' Online Storefronts to use the KAWS Trademarks or Companion Copyright, and neither Defendants nor Defendants' Online Storefronts are authorized retailers of the genuine KAWS Products.

48.     Defendants, without any authorization or license from KAWS, have knowingly and willfully used and continue to use the KAWS Trademarks and Companion Copyright in connection with the manufacture, advertisement, distribution, offering for sale, and sale of the Counterfeit and Infringing Products into the United States and Florida over the Internet.

49.     Defendants, directly and through Defendants' Online Storefronts, offer shipping to the United States, including in this District and, on information and belief, Defendants offered to sell and have sold counterfeit KAWS products into the United States, including in this District, which is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming KAWS.

## IV.     Defendants' Direct Involvement and Key Role in the Counterfeiting and Infringement of the KAWS Trademarks and Companion Copyright.

50.     Printify is not a passive print shop. Printify and Printify's Founder are directly involved as active participants in the creation and supply of Counterfeit and Infringing Products. Among other actions taken by Defendants, and subject to further discovery regarding their direct involvement, Defendants: (1) provide trademarked and copyrighted content to their counterfeiting merchant partners

17

in exchange for a fee, (2) exercise significant control over creation, manufacturing, printing, selling, shipping, customer service, and (3) engage in other essential tasks needed to bring the products into existence and into the market.

### A. Defendants Supply and Use the KAWS Trademarks and Companion Copyright.

51. Defendants, through Printify's "partnership with Shutterstock," supply millions of images for use in the creation of products (the "Printify Image Database"). Upon information and belief, Defendants control and maintain the Printify Image Database.

52. Defendants falsely represent that "[a]ll available content [in the Printify Image Database] is licensable for commercial use." But the Printify Image Database contains KAWS intellectual property, including images utilizing the KAWS Trademarks and Companion Copyright, that is not licensable for commercial use, and Defendants induce merchants to infringe on that protected IP. Moreover, Defendants profit from the use of these images, with Printify collecting a 17.5% fee for each product bearing the infringing KAWS Trademarks and/or Companion Copyright sold to a consumer.

53. Defendants conduct is egregious. Defendants do not just supply merchants with some infringing content. Rather, Defendants supply merchants with approximately *100 distinctly different designs* that infringe KAWS's intellectual property rights, and that are expressly identified by Defendants and presented to merchants as being "KAWS'" content, all the while allowing merchants to proceed on the falsified basis that the unauthorized and infringing content is free to license and commercialize, but just in exchange for Defendants' fee. Below are exemplary infringing designs provided by Defendants in the Printify Image Database:

18

  

54.    In addition to supplying infringing content through the Printify Image Database, Defendants allow and arguably go so far as to encourage merchants to upload the KAWS Trademarks and Companion Copyright to create Counterfeit and Infringing Products.  Recognizing the "very dangerous possibility" of "intellectual property theft," Defendants instruct merchants to make sure to slightly modify any "settled work" that Defendants will print on apparel—in other words, to walk the gray line with no clear instructions on what actions may lead them into infringement territory.

55.    At the hand of Defendants, merchants have uploaded the KAWS Trademarks and Companion Copyright to Printify, with trivial modification (if any), and Defendants have published additional infringing works to Defendants' Online Storefronts and subsequently manufactured and shipped additional Counterfeit and Infringing Products to end consumers.

**B.    Defendants Manufacture the Counterfeit and Infringing Products.**

56.    Defendants exercise control over the manufacture and creation of the Counterfeit and Infringing Products, including the selection of items to be manufactured and the process of arranging for the manufacturing.  Printify's default is to deploy its "Printify Choice" option, where Printify "automatically selects the most suitable Print Provider in [its] network, considering factors such as price, quality, and the location of [the] customer, while also ensuring maximum profitability for [the merchant's] business."  The details of the Print Provider selected by Printify are not even accessible by the merchant, further demonstrating Defendants' direct involvement and control.

57.    Printify has described the services it offers as those of a print provider in control of its

own operations and services.[4] In its 2015 Trademark/Service Mark Application submitted to the USPO

for the registration of its "Printify" mark on the Principal Registrar and signed by Mr. Berdigans,[5]

Defendants described Printify's services as including: "Design printing for others; Digital on-demand

printing services of books and other documents; Digital photo printing services; Digital printing; Direct-

to-garment printing services; Fine art printing services; Offset printing; Photographic printing; Printing;

Printing of advertising brochures for others; Printing of patterns on textiles; Printing services; Screen

printing; Silk screen printing."

58.     In support of Defendants' application for the "Printify" trademark, Mr. Berdigans further

submitted the then current terms and conditions of Printify, stating that Printify holds title to its products,

and that title passes from Printify only after the production of a customized product ordered by an end

consumer. Put another way, even Defendants take the position that title passes from Printify only *after*

---

[4] Rule 201(b)(2) of the Federal Rules of Evidence permits federal courts to take judicial notice of "a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot be readily questioned." Fed. R. Evid. 201(b)(2). Courts have determined that this rule allows for judicial notice of federal trademark registrations. *See, e.g., Reed v. General Mills, Inc.*, No. 19-CV-0005-JCC, 2019 WL 2475706 (W.D. Wash. June 13, 2019); *Children's Miracle Network v. Miracles for Kids, Inc.*, No. 18-CV-01227, 2018 WL 8243998 (C.D. Cal. Dec. 6, 2018).

[5] Note when signing the declaration for these applications, the foregoing: "The signatory believes that: if the applicant is filing the application under 15 U.S.C. § 1051(a), the applicant is the owner of the trademark/service mark sought to be registered; the applicant is using the mark in commerce on or in connection with the goods/services in the application; the specimen(s) shows the mark as used on or in connection with the goods/services in the application; and/or if the applicant filed an application under 15 U.S.C. § 1051(b), § 1126(d), and/or § 1126(e), the applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the goods/services in the application. The signatory believes that to the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive. The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true."

Printify has already manufactured and created counterfeit or infringing goods.

59.     Printify advertises that any "Printify product" passes three quality control checks, including checks by Printify in-house experts: 1) "[w]hen blank products arrive at *our* printing locations" (emphasis added); 2) "[b]efore printing"; and 3) "[a]fter printing to compare final product against original design." Given Defendants' control over the manufacturing process, including the fact that Defendants have the ongoing ability to monitor products before, during, and after creation, the fact that in-house "experts" conduct quality control checks is not surprising. Likewise, given Defendants' apparent and complete disregard for intellectual property rights, neither is the fact that these checks do nothing to stifle the amount of Counterfeit and Infringing Products manufactured by Defendants, despite Defendants' ability to filter out trademarked and copyrighted material. Instead, Defendants perpetuate infringement and counterfeiting because it is profitable.

60.     In sum, Defendants manufacture and create Counterfeit and Infringing Products that would not have existed but for Defendants' enterprise and exercise control over every step of the process.

**C.     Defendants' Control over Customer Service.**

61.     Defendants exercise control over customer service relating to the sale of Counterfeit and Infringing Products, including managing and shipping orders and handling customer complaints and returns, through Printify Connect and other Printify services.

62.     With Printify Connect, Defendants promise to "drop[] the middleman" so that customers can contact ***Printify's*** "support team directly – ***without your involvement***." Printify is the one that manages orders, handles customers, and claims to handle "issues ***ourselves***." All the while, end consumers are not informed that Printify is "handling" customer service.

63.     Printify sends emails to customers confirming their orders for Counterfeit and Infringing Products. Printify selects the wording of these emails, and Defendants' Online Storefronts do not have

21

the option of altering this wording.

64.     Once an order for Counterfeit and Infringing Products is delivered, Printify sends an email to the customer "where they can either leave a review or report a problem."

65.     Customers can purportedly report problems "directly to our [Printify] Support Team" and can "request a free replacement or refund." Printify—not any third-party merchant associated with any of Defendants' Online Storefronts—then "evaluate[s] the customer's request and proceed[s] accordingly, informing you [the merchant] of the outcome" and Printify's "final decision."

66.     Notably, if a customer leaves a review, those reviews are "not available to anyone" except Defendants.

**V.     Defendants' Deliberate Concealment in Its Infringement and Counterfeiting Practices.**

67.     Defendants have gone to great lengths to try to avoid liability by hiding behind automated practices designed to conceal Printify's identity and the full scope and interworking of Defendants' illegal counterfeiting operation.

68.     To merchants, Defendants represent that Printify "take[s] care of your reprints and refunds directly *without your customers ever knowing it was us*," offers to "make customer support easier for you *behind the scenes without ever referencing Printify*," sends an order confirmation email to customers (that merchants are not even privy to) that "*doesn't reference Printify in any way*," and provides a page concerning orders where customers "*won't see any reference to Printify*," only Defendants' Online Storefronts.

69.     Defendants make it difficult, if not nearly impossible, for customers to ever know Printify's involvement, despite customers dealing directly with Printify in all phases of the purchase of the Counterfeit and Infringing Products.

70.     Upon the sale of each Counterfeit and Infringing Product, Printify sends a confirmation email to the customer. Even though Printify sends that email, Defendants alter the "sender" to identify

22

a *fake outgoing email address* from the Defendants' Online Storefront instead.

71.     Some of those fake email addresses do not even work, making it difficult for customers to contact Defendants' Online Storefronts via email, considering Printify itself does not provide its own email address.

72.     Additionally, Defendants select the return addresses for the shipped packages (sometimes regardless as to whether or not a third-party merchant has opted not to use Printify's "default" return addresses), often selecting random return addresses or virtual addresses that make it difficult for the consumer to track or locate the purported seller of the Counterfeit and Infringing Products, that additionally, more often than not actually originate from nowhere near the listed return location.

## V.     Defendants Actively Discourage the Enforcement of Intellectual Property Rights.

73.     Despite Defendants' direct involvement and critical role in the manufacture, creation, and distribution of the Counterfeit and Infringing Products, Defendants seek to disclaim any responsibility from liability in respect of their infringing and non-compliant conduct. Indeed, Printify's Terms of Service, Intellectual Property Policy, and disclosures are at odds with Defendants' actual practices and corresponding legal obligations.

74.     As established above, Printify controls the infringement and counterfeiting process, triggering certain legal obligations. Defendants maintain the Printify Image Database, advertise infringing KAWS Marks and copyright works (including the Companion Copyright), and encourage others to use them, including on the Printify "mock-up generator," allowing a never ending amount of uploaded content that infringes intellectual property rights to be applied to goods in digitized form via its "mock-up generator," manage the printing process that prints the infringing KAWS Marks and copyright works, as well as the other uploaded infringing content onto physical goods, handle the Counterfeit and Infringing Products after they come off the printers, handle the bagging and shipment

of those products, process payments, and handle any customer service issues related to the sale of the Counterfeit and Infringing Products.  Additionally, Defendants vigorously publish, advertise, and offer for sale goods bearing the KAWS Trademarks and Companion Copyright through Defendants' Online Storefronts, and in exchange, receive revenue from the sale of the Counterfeit and Infringing Products.

75.     Defendants also attempt to portray Printify as safeguarding intellectual property rights while doing the opposite.  Printify's Intellectual Property Policy claims that Printify "feel[s] strongly" about people "stealing intellectual property," and its Terms of Service "warn" that "Printify may use its discretion to remove Your Content from our Service, at any time, with or without prior notice to you, if it violates any of our Terms of Service or policies *or is reported to be infringing on intellectual property rights of others*."  These words are inconsequential.

76.     In August 2023, for example, a merchant disclosed that its "Etsy account was banned" because of intellectual property infringement.  The merchant's existing Printify account (still active) was connected to the now banned Etsy account.  Seeking to continue selling products on Etsy via Printify, the merchant asked whether Printify would report the merchant (or its Printify account) to Etsy if the merchant created a new Etsy account and connected its existing Printify account to the new Etsy store.  Evading the question posed, Printify responded that the merchant "can [continue to] use your existing Printify account"—making no effort to investigate, even less to take remedial action, on the reported infringement.  Instead, Printify encouraged the merchant to create a new Etsy account to circumvent Etsy's intellectual property enforcement efforts and simply "connect" its existing Printify account.

77.     Defendants actively discourage any reporting of intellectual property infringement and make it difficult for intellectual property owners to report such incidents.  For example:

          a.     The link to Defendants' "Trademark Violation Form" (the "Violation Form") is found only through Printify's "Intellectual Property Policy" on

www.printify.com (the "IP Policy"), a policy stated to be "an important contract between Printify and our Users" regarding the intellectual property of only those parties—Printify and Printify "Users," not any third party rights holder. By doing so, Printify suggests from the outset that Printify's IP Policy is not the right place for rights holders to look, even though it is in fact the *only* place where the Violation Form is located.

b.   The IP Policy provides a link to Printify's Violation Form, but states that its use is for Printify Users that may be concerned someone is infringing upon any of *their* trademarks, and not for the use by any third parties whose rights have been infringed by Defendants.

c.   In the event a third party continues on to access the Violation Form even after Defendants' initial attempts to dissuade them from doing so, it is only then apparent that the Violation Form is actually a mechanism, and the *only* mechanism, Defendants provide to report instances of infringements to Defendants, including in connection with Defendants' Online Storefronts.[6] Even then, the Violation Form cautions and discourages reporting, stating that:

1.   If Defendants' Online Storefront is using a trademark to review or criticize products or services, Defendants do not consider that to be trademark infringement, and they will "promptly reject your complaint," so "please don't submit your complaint."

2.   Before reporting, you need to contact Defendants' Online Storefront directly, even by leaving a comment on any social media post requesting

---

[6] The Violation Form states: "Have you found a website with products made on Printify that you believe is infringing on your trademark? Before you report it, please ask yourself these 3 questions[.]"

the site owner contact you.

3. You need to confirm that the allegedly infringing product was really created on Printify, and not somewhere else, including a different POD company.

4. Only if you cannot contact the publicly facing "owner" of Defendants' Online Storefront or cannot resolve the issue with them directly, you are to proceed with filling out the TMV.

d. Even if a Violation Form is submitted, Defendants make clear that *if they chose to act at all*, they will act only as a mere facilitator between the relevant Printify merchant connected to Defendants' Online Storefront and complainant, notifying the merchant of the complaint and giving them every opportunity to submit a counternotice to the complainant. Even after that, Defendants maintain it is the merchant's sole discretion as to whether or not any infringing content is ultimately removed and at no stage consider themselves to be a party to the complaint.

78. Defendants' "reporting" procedures are head-in-the-sand tactics to stifle reporting, for Defendants' financial benefit.

79. Additionally, Printify purports to provide "24/7" chat support for merchants seeking "help with anything to do with your Printify account or any orders," but apparently is unable to provide help relating to intellectual property issues on its site, as evidenced below.



## VI.    Printify's History of Violations.

80.    This is not the first time Printify has disregarded intellectual property rights.

81.    In 2019, competitor Printful Inc. ("Printful"), arguably Defendants' largest threat in the POD industry, sued Printify for copyright infringement, 17 U.S.C. § 501, and for violations of the Lanham Act, 15 U.S.C. § 1125(a), among other claims. *See* Complaint, *Printful, Inc. v. Printify, Inc.*, Case No. 19-CV-07903 (N.D. Cal. Dec. 2, 2019).

82.    Printful alleged that it had invested years and resources developing and refining a plugin that enabled shipping rate setups for users. *Id.* ¶¶ 12–14. Shortly after Printful made its copyrighted program available to the public, Printify copied and modified Printful's program and released its own integration. *Id.* ¶¶ 21–35. Printify also "removed [Printful's] registered trademark 'Printful' from the [Printful] program in order to pass the Infringing Plugin off as originating wholly from Printify." *Id.* ¶¶ 36–39.

83.    The case settled.  As part of the settlement, in addition to monetary payment, Printify admitted to downloading and copying portions of Printful's copyrighted software and was permanently enjoined from unlawfully using Printify's copyrighted software again without providing a copyright

27

notice of Printful's authorship.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

84.     KAWS repeats and incorporates by reference its allegations contained in paragraphs 1–83 of this Complaint.

85.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the registered KAWS Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of counterfeit and infringing goods. The KAWS Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from KAWS's products provided under the KAWS Trademarks.

86.     Defendants have manufactured, sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the KAWS Trademarks without KAWS's permission. Alternatively, Defendants have caused to be manufactured, sold, offered to sell, marketed, distributed, and advertised, and are still causing to sell, offer to sell, market, distribute, and advertise products in connection with the KAWS Trademarks without KAWS's permission.

87.     Defendants are directly liable for the actions described above.

88.     Alternatively, Defendants are vicariously and/or contributorily liable for the actions described above. Defendants intentionally induce others to infringe the KAWS Trademarks. Defendants also continue to supply their services to those that Defendants know or have reason to know are engaging in the infringement of the KAWS Trademarks. When Defendants had reason to know that counterfeit KAWS goods were being sold through their website, Defendants have been willfully blind by intentionally shielding themselves from discovering the offending listings and the identities of

28

infringers.

89.     KAWS is the registered owner of the KAWS Trademarks and official source of KAWS Products.  The United States Registrations for the KAWS Trademarks (Exhibit 1) are in full force and effect.  Upon information and belief, Defendants have knowledge of KAWS's rights in the KAWS Trademarks and are willfully infringing and intentionally using counterfeits of the KAWS Trademarks. Defendants' willful, intentional, and unauthorized use of the KAWS Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit goods among the general public.

90.     Defendants' activities constitute willful trademark infringement and counterfeiting under 15 U.S.C. §§ 1114, 1117.

91.     The injuries and damages sustained by KAWS have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit KAWS products.  Alternatively, the injuries and damages sustained by KAWS have been directly and proximately caused by Defendants' causing of the wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit KAWS products.

92.     KAWS has no adequate remedy at law, and, if Defendants' actions are not enjoined, KAWS will continue to suffer irreparable harm to its reputation and the goodwill of its well-known KAWS Trademarks.

### SECOND CAUSE OF ACTION
### TRADEMARK DILUTION (15 U.S.C. § 1125(c))

93.     KAWS repeats and incorporates by reference its allegations contained in paragraphs 1–83 of this Complaint.

94.     KAWS has engaged in extensive nationwide advertising, promotion, and use of the KAWS Trademarks for many years.  KAWS has had massive sales of goods and services bearing such

29

marks for decades.

95.     The KAWS Trademarks have for many years received extensive unsolicited media attention nationwide.  Such extensive and frequent media attention and commercial success has had a substantial impact on the public and has long created an association in the minds of consumers between KAWS and the KAWS Marks, such that these marks are famous and were famous nationwide before Defendants commenced their unauthorized use of those marks.

96.     Defendants' actions, all occurring after the KAWS Marks became famous, are likely to cause dilution by blurring and dilution by tarnishment of the distinctive quality of those trademarks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

97.     Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

98.     The actions of Defendants described above have at all times relevant to this action been willful.

99.     As a direct and proximate result of the actions of Defendants as alleged above, KAWS has been and will continue to be damaged and irreparably harmed.

100.    KAWS has no adequate remedy at law.

### THIRD CAUSE OF ACTION
### FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

101.    KAWS repeats and incorporates by reference its allegations contained in paragraphs 1–83 of this Complaint.

102.    Defendants' promotion, marketing, offering for sale, and sale of counterfeit KAWS products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with KAWS or the origin, sponsorship, or approval of Defendants' counterfeit KAWS products by KAWS.  Alternatively, Defendants' causing of the

promotion, marketing, offering for sale, and sale of counterfeit KAWS products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with KAWS or the origin, sponsorship, or approval of Defendants' counterfeit KAWS products by KAWS.

103.   By using the KAWS Trademarks in connection with the sale of counterfeit KAWS products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the counterfeit KAWS products.

104.   Defendants' conduct constitutes willful false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the counterfeit KAWS products to the general public under 15 U.S.C. §§ 1114, 1125.

105.   KAWS has no adequate remedy at law, and, if Defendants' actions are not enjoined, KAWS will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

## FOURTH CAUSE OF ACTION
### COPYRIGHT INFRINGEMENT (17 U.S.C. § 101, et seq.)

106.   KAWS repeats and incorporates by reference its allegations contained in paragraphs 1–83 of this Complaint.

107.   KAWS owns all exclusive rights, including without limitation the rights to reproduce the copyrighted work in copies, to prepare derivative works based upon the copyrighted work, and to distribute copies of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending, in various copyrights for the KAWS products, including without limitation the Companion Copyright.

108.   Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the Companion Copyright without KAWS's permission. Alternatively, Defendants have caused to be sold,

offered to sell, marketed, distributed, and advertised, and are still causing the selling, offering to sell, marketing, distributing, and advertising products in connection with the Companion Copyright without KAWS' permission.

109.    Defendants had access to the KAWS products incorporating KAWS's registered Companion Copyright before Defendants created the infringing KAWS products.

110.    Upon information and belief, Defendants have directly copied KAWS's Companion Copyright. Alternatively, Defendants' representations of KAWS's Companion Copyright through at least the Defendants' Online Storefronts are strikingly similar, or at the very least substantially similar, to KAWS's Companion Copyright and constitute unauthorized copying, reproduction, distribution, creation of a derivative work, and/or public display of KAWS's Companion Copyright. As just one example, Defendants deceive unknowing consumers by using the Companion Copyright without authorization on products advertised via the Defendant's Online Storefronts to attract customers as follows:

*Image of KAWS's Registered Companion Copyright*



*Compared to Exemplary Counterfeit and Infringing KAWS Products*
*Sold by Defendants' Online Storefronts*





111. The Companion Character has a distinctive design of a cartoon-like character with smooth, rounded features. Companion has two signature "X" eyes on its large, skull-shaped face, three fingers and a thumb on each gloved hand, and rounded shoes. The BFF Character has large, oversized ears and similarly features a large head with "X" eyes, gloved hands, and large rounded shoes. These design elements, especially the "X" eyes, make KAWS instantly identifiable. The Counterfeit and Infringing Products both depict characters with identical design elements. An average lay observer would recognize Defendants' Counterfeit and Infringing Products as having been appropriated from the Companion Character and BFF Character copyrights (including those comprising the Companion

Copyright), and the similarity in appearance is so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded.

112.    Defendants' exploitation of KAWS's Companion Copyright in connection with Defendants' Online Storefronts constitutes infringement of KAWS's Companion Copyright.

113.    On information and belief, Defendants' infringing acts were willful, deliberate, and committed with prior notice and knowledge of KAWS's copyright.  Each Defendant willfully, wantonly, and in conscious disregard and intentional indifference to the rights of KAWS made and distributed in the United States, including this District, caused to be made and distributed in the United States, including this District, and aided, abetted, contributed to, and participated in the unauthorized making and distribution of Counterfeit and Infringing Products.

114.    Each Defendant either knew, or should have reasonably known, that KAWS's genuine products, particularly those depicting the famous companion character possessing the distinctive KAWS skull-and-crossbones heads and X eyes, were protected by copyright and their representations infringed on KAWS's copyright.  Each Defendant continues to infringe upon KAWS's rights in and to the Companion Copyright.

115.    Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

116.    KAWS has no adequate remedy at law, and, if Defendants' actions are not enjoined, KAWS will continue to suffer irreparable harm to its reputation and the goodwill of its well-known Companion Copyright.

### FIFTH CAUSE OF ACTION
### UNFAIR COMPETITION (Florida Common Law)

117.    KAWS repeats and incorporates by reference its allegations contained in paragraphs 1–83 of this Complaint.

34

118. KAWS has not licensed or authorized Defendants to use the KAWS Trademarks or Companion Copyright, and none of the Defendants are authorized retailers of genuine KAWS Products.

119. Defendants knowingly and intentionally trade upon KAWS's reputation and goodwill by selling and/or offering for sale products in connection with KAWS's Trademarks and/or Companion Copyright. Alternatively, Defendants knowingly and intentionally trade upon KAWS's reputation and goodwill by causing products to be offered for sale and/or sold in connection with the KAWS Trademarks and/or Companion Copyright.

120. Defendants' promotion, marketing, offering for sale, and sale of Counterfeit and Infringing Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the quality, affiliation, connection, or association with KAWS or the origin, sponsorship, or approval of Defendants' Counterfeit and Infringing products by KAWS. Alternatively, Defendants' causing of the promotion, marketing, offering for sale, and sale of Counterfeit and Infringing Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the quality, affiliation, connection, or association with KAWS or the origin, sponsorship, or approval of Defendants' Counterfeit and Infringing Products by KAWS.

121. Defendants knew, or should have known, that their promotion, marketing, offering for sale, and sale of counterfeit KAWS products has caused and will continue to cause confusion, mistake, and deception among purchasers, users, and the public. Alternatively, Defendants knew, or should have known, that their causing of promotion, marketing, offering for sale, and sale of counterfeit KAWS products has caused and will continue to cause confusion, mistake, and deception among purchasers, users, and the public.

122. In fact, Defendants have fraudulently represented by their statements and actions that the Counterfeit and Infringing Products are KAWS's products including, for example, by using deceptive advertising practices in connection with the Defendants' Online Storefronts, and taking other steps to

deceive and confuse the consuming public.

123. On information and belief, Defendants' conduct is willful and intentional as Defendants attempt to avoid liability by concealing Printify's identity and using Defendants' Online Storefronts to operate their illegal counterfeiting operations.

124. KAWS has no adequate remedy at law, and Defendants' conduct has caused KAWS to suffer damage to its reputation and goodwill. Unless enjoined by the Court, KAWS will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

**PRAYER FOR RELIEF**

WHEREFORE, KAWS prays for judgment against Defendants as follows:

1. An injunction temporarily, preliminarily, and permanently enjoining Defendants and their employees, agents, officers, directors, owners, shareholders, principals, subsidiaries, related companies, affiliates, distributors, dealers, retailers, wholesalers, manufacturers, vendors, successors, assigns, and all persons acting for, with, by, through, under, or in active concert with them from:

    a. using the KAWS Trademarks or Companion Copyright in any way, including without limitation for any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the manufacture, distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine KAWS product or is not authorized by KAWS to be sold in connection with the KAWS Trademarks or Companion Copyright;

    b. passing off, inducing, or enabling others to sell or pass off any product as a genuine KAWS product or any other product produced by KAWS that is not KAWS's or not produced under the authorization, control, or supervision of KAWS and approved by KAWS for sale under the KAWS Trademarks or Companion Copyright;

    c. committing any acts calculated to cause consumers to believe that

36

Defendants' Counterfeit and Infringing Products are those sold under the authorization, control, or supervision of KAWS, or are sponsored by, approved by, or otherwise connected with KAWS;

       d.     further infringing the KAWS Trademarks or Companion Copyright and damaging KAWS's goodwill;

       e.     shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for KAWS, nor authorized by KAWS to be sold or offered for sale, and which bear any Plaintiff trademark or copy any KAWS copyright, including the KAWS Trademarks or Companion Copyright or any reproductions, counterfeit copies, or colorable imitations thereof;

       f.     using, linking to, transferring, selling, exercising control over the Defendants' Online Storefronts, or any other domain name or online marketplace account that is being used to sell or is the means by which Defendants could continue to sell counterfeit KAWS Products; and

       g.     operating and/or hosting websites that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing the KAWS Trademarks or Companion Copyright, or any reproduction, counterfeit copy or colorable imitation thereof that is not a genuine KAWS Product or not authorized by KAWS to be sold in connection with the KAWS Trademark or Companion Copyright; and

       h.     assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the subparagraphs above.

    2.     An order directing Defendants to destroy all marketing, advertising, or promotional materials depicting or referring to such Counterfeit and Infringing Products, confirm such destruction

in writing to KAWS, and provide to KAWS the identity and complete contact information and payee information for all persons and entities that made, produced, or advertised or sold the Counterfeit and Infringing Products.

3.      An order requiring Defendants to account for and pay to KAWS all profits arising from the unlawful acts herein alleged, and an increasing of such profits for payment to KAWS as provided by 15 U.S.C. § 1117 and any other applicable statute or law.

4.      An order requiring Defendants to pay KAWS statutory damages pursuant to 15 U.S.C. § 1117(c) of not less than $1,000 and not more than $2,000,000 for each and every use of the KAWS Trademarks and statutory damages of not less than $750 and not more than $30,000 for each and every infringement of the Companion Copyright pursuant to 17 U.S.C. § 504(c), which should be enhanced to a sum of not more than $150,000 by 17 U.S.C. § 504(c)(2) because of Defendants' willful copyright infringement.

5.      Compensatory damages according to proof.

6.      Punitive damages according to proof.

7.      Reasonable attorneys' fees and costs.

8.      Prejudgment interest on all damages awarded by this Court.

9.      An order awarding any and all other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all claims.

Dated: October 24, 2023                   Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By: /s/
Rossana Baeza (FL Bar No. 1007668)
rbaeza@bsfllp.com
James Lee (FL Bar No. 67558)

38

jwlee@bsfllp.com
100 SE 2nd Street, Suite 2800
Miami, FL 33131
Telephone: (305) 357-8436

Katie Kavanaugh*
kkavanaugh@bsfllp.com
John Kucera*
jkucera@bsfllp.com
Genesis Shin*
gshin@bsfllp.com
2029 Century Park East, 1520N
Los Angeles, CA 90067
Telephone: (213) 629-9040

Maxwell Pritt*
mpritt@bsfllp.com
Beko O. Reblitz-Richardson*
brichardson@bsfllp.com
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Telephone: (415) 293-6800

*Application to appear *pro hac vice*
forthcoming

***Attorneys for Plaintiff KAWS, Inc.***